UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CASE No. A-06-CR-069 SS |
| | § | |
| CHARLES THOMAS CLAYTON, | § | |
| | § | |
| Defendant. | § | |

**MOTION TO REVOKE SUPERVISED RELEASE**

The United States Attorney for the Western District of Texas moves to revoke the Defendant's supervised release. The allegations set forth in this Motion reveal that Defendant has been playing a shell game with his financial resources and that he has provided his supervising probation officers in Houston with an incorrect statement of his monthly expenditures. This has resulted in Defendant once again dodging his court ordered financial obligations. Some of Defendant's Noncompliance was previously summarized in a Report on Offender Under Supervision, Document 100, which revealed Defendant's failure to pay his court ordered fine and prosecution costs.

**BACKGROUND**

On May 14, 2012, the United States received a copy of Document 100 in this case (Report on Offender Under Supervision) which indicated that the Defendant was close to the end of his supervision and had paid less than 2% of his fine and 0% towards his costs of prosecution. As the United States has had no contact with CLAYTON since 2006, and had not been contacted by the

Houston Probation Office prior to the filing of Document 100, this severe shortfall was confounding to the United States. Under the Section entitled "U.S. Probation Officer Action" of Document 100, it stated that "A subsequent financial analysis was completed on March 30, 2012, and the defendant had a net cash flow of -$2551.05." There was no explanation of how Defendant would even be able to survive on such a large negative cash flow. The document raised more questions than it answered.

Since that time, the United States has been in contact with Austin United States Probation Officer (USPO) Laura Howard and Derek Glover, CLAYTON's supervising USPO in Houston. Ms. Howard related how she only recently became acquainted with this case when the Houston Office called in an attempt to get permission for CLAYTON to travel to the Cayman Islands for a seminar (later revealed to be the DMX Innovator Seminar). Upon learning further circumstances regarding CLAYTON's noncompliance, this request was denied. The United States had not been informed of CLAYTON's request for travel to the Cayman Islands.[1]

CLAYTON's supervising USPO was contacted regarding CLAYTON's claimed monthly expenses. It was at this time that the United States learned that CLAYTON reported he received $10,000 a month in gross wages but only paid $25 a month toward his fine. This occurred because CLAYTON "claimed" that his net pay was $7,400 a month and that his expenses were $9,982.05. Due to this "claimed" $2,582.05 shortfall, CLAYTON portrayed himself as having no extra money to pay for a fine until his medical license was reinstated. The United States has examined CLAYTON's "claimed" expenses as well as his "actual" payments for these expenses which reveal

---

[1] After learning of the request, however, the United States conducted a computer search regarding the DMX Innovator Seminar, and a you-tube video of last year's seminar primarily showed the participants relaxing on the beach, in a boat on the ocean, swimming with stingrays, smoking cigars or dancing on the beach. This did not inspire confidence regarding the true focus of the travel. Nor did it indicate that CLAYTON had his priorities in order given his severe shortfall on his court ordered financial obligations, much less his previous background of repeatedly dodging his responsibility to pay taxes.

that he has misrepresented his actual expenses to the United States Probation Office in violation of his terms and conditions of supervision (as further related below).

## CLAYTON'S TERMS AND CONDITIONS OF SENTENCE

On December 20, 2006, Defendant Charles Thomas Clayton was sentenced to a total of 60 months in prison[2], ordered to pay $350 in special assessments and a fine of $50,000. The Defendant was also ordered to serve one year of supervised release "on each of Count 1, 2, 3, 4, 5, 6, 7 and 8 concurrently." In addition to the mandatory, standard conditions, the Court imposed the following "additional conditions":

> "The defendant shall participate in a program of mental health treatment, as directed by the probation officer, until such time as the defendant is released from the program by the probation officer.
>
> The defendant shall upon request of the probation office, authorize release of any and all financial information, to include income records, income tax records, and social security records, by execution of a release of a financial information form or by other appropriate means.
>
> If it is determined by the IRS that the defendant has a tax liability, the defendant shall cooperate with the IRS and satisfy the financial obligation.
>
> The defendant shall pay the costs of prosecution in the amount of $7,455.98."

On June 23, 2011, the Defendant was released from BOP custody and began his one year period of supervised release. The Defendant was supervised by the U.S. Probation Office in the Southern District of Texas, because the defendant resides in that district.

## VIOLATIONS OF CONDITIONS OF SUPERVISION

The United States Attorney's Office, in conjunction with information provided by the United States Probation Office, believes that the offender has violated the following conditions of supervision:

---

[2] Defendant was sentenced to be imprisoned "for a term of Thirty-six (36) months on count 1, and a term of Twenty-four (24) months on Count 2 to be served consecutively. Defendant shall serve a term of Twelve (12) months on Counts 3, 4, 5, 6 and 7 to be served consecutively to each other but concurrently to Counts 1 and 2 to produce a total of Sixty months. Defendant shall further serve a term of Twelve (12) months on Count 8 to be served concurrently to all other Counts to the extent necessary to produce a term of SIXTY (60) months.

**Violation of Standard Condition No. 1:**  "The defendant shall answer truthfully all inquires by the Probation Officer and shall follow the instructions of the Probation Officer."

**Violation of Standard Condition No. 18**: "If the judgment imposes other criminal monetary penalties, it is a condition of supervision that the defendant pay such penalties in accordance with the Schedule of Payments sheet of the judgment."

**Violation of Standard Condition No. 19**: "If the judgment imposes a fine, special assessment, restitution, or other criminal monetary penalties, it is a condition of supervision that the defendant shall provide the probation officer access to any requested financial information."

**Violation of Additional Conditions in Judgment:**

> "If it is determined by the IRS that the defendant has a tax liability, the defendant shall cooperate with the IRS and satisfy the financial obligation."

> "The defendant shall pay the costs of prosecution in the amount of $7,455.98."

## NATURE OF NONCOMPLIANCE

**Failure to Pay Fine, Costs of Prosecution, or Tax Liability**

As previously indicated in the Report on Offender Under Supervision filed on May 14, 2012, Defendant has failed to pay his fine. In fact, Defendant has paid less than 2% of his fine despite a reported gross income of $120,000. As of May 2, 2012, Defendant owed $49,240 on his fine. Even with a $25 payment in May and June, this still leaves a remaining debt of $49,190 out of a $50,000 fine.

Defendant has paid zero toward his costs of prosecution. Defendant owes $7,455.98 towards his court ordered prosecution costs.

Defendant reported to his probation officer that instead of attempting to pay his remaining tax liabilities after being released from prison and obtaining employment, he instead discharged his tax debt through bankruptcy. This occurred when he was released to a halfway house from prison. In this way, Defendant used his incarceration to his benefit on his bankruptcy filing, since he had no income to report in those years he was in prison and no need to report this bankruptcy filing to a supervising probation officer. Once under supervision, Defendant informed his probation officer of his bankruptcy filing and informed his supervising officer that USPO could get all of his bankruptcy filing information on PACER. USPO did obtain the documents which demonstrate CLAYTON filed bankruptcy on January 17, 2011 (a few months prior to being placed on supervision). He listed on Schedule F, Creditors Holding Unsecured Nonpriority Claims his tax debts for 1999, 2000, 2001, 2002, 2003, 2004, 2005, and 2006 in a total amount exceeding $1.5 million. In his March 30, 2012 report to his USPO, CLAYTON confirmed that all of his IRS debt

was discharged as opposed to Defendant satisfying this financial obligation.  Note that on January 17, 2011, Defendant listed his monthly expenses at $5,117.57 on his bankruptcy filing compared to the $9,982.05 Defendant indicated about a year later to his USPO.

Defendant has repeatedly promised to up his fine payment as soon as his medical license is reinstated (and to pay it ahead of schedule) but it appears that just as he dodged his tax liability he has timed the obtaining of his medical license for the time his supervision expires.  As will be further demonstrated below, had defendant been serious about paying his fine, there was money to do so as he over-inflated his "necessary" expenses to U.S. Probation.

### Failure to Provide Truthful Information to U.S. Probation

Payroll Deductions and Income Tax liability

Defendant submitted monthly expense and income statements to U.S. Probation.  The United States has attached a recent submission provided by Defendant as Exhibit 1.  Defendant lists his gross income as $10,000 a month and his net income (after payroll deductions) as $7,400.  In reality, Defendant has received the entire $10,000 each month ($2,600 has not been deducted from the payments he has received into his bank account).  In fact, on Defendant's expense report he has also listed a monthly estimated expense of $1,400 for his income taxes.  In other words, Defendant has double listed his tax obligations.  He reduced his salary by $2,600 a month for an amount that was never taken from his salary.  Contrary to his representations to U.S. Probation, there was no true deficit between his take home and expenses.

On Defendant's June 2011 monthly report (right after he was placed on supervision) Defendant listed $4,000 a month in income and $7,000 in expenses.  This reported shortfall resulted in the minimal $25 a month payment for fine.  Beginning in August 2011 he reported an increase in salary to a net of approximately $8,000 but also reported expenses of $7,800 a month.  When he itemized his expenses as shown in Exhibit 1, he now stated his expenses were $9,982.05 and his net salary was $7,400.  Defendant's monthly expenses, therefore, have variously been reported as $5,117.57 (January 2011 bankruptcy declaration), $7,000 (June 2011 monthly report), $7,800 (September 2011 monthly report), and $9,982.05 (March 30, 2012 itemized expense report to USPO).  Clearly, Defendant "played" with his expenses and income as he deemed necessary to keep him at the minimum fine.

It is also noteworthy, that at the request of the United States, USPO Derek Glover went to CLAYTON's home for a visit to see if he could obtain more detailed statements regarding CLAYTON's financial obligations than CLAYTON had previously provided.  This visit was unannounced and occurred on May 22, 2012.  Following this visit, on May 24, 2012, CLAYTON wrote a letter to his USPO for the first time claiming that he was really only receiving $30,000 a year of income from U.S. Imaging and that the additional $90,000 a year he had previously received and reported as income was really a "loan" and that this was why he would only be reporting $30,000 in income on his 2012 income taxes.  He said that he had been over estimating his income taxes "just

to be on the safe side. I fill out this form myself, as I cannot afford to have the accountant do it. This is why the estimates do not exactly match up with the detailed expenses on the March spreadsheet, and that I was underestimating the actual expenses on the form, but the PO form did not give any room to break things down more precisely. Once again, I was not deliberately misrepresenting anything, just being overly careful in a general sort of way." This letter is attached as Exhibit 2. Since Clayton has been estimating a total of $4,000 a month in income taxes ($2,600 taken out of his gross and $1,400 added to his expenses) that means he has been claiming $48,000 in tax expenses on what he now claims is a $30,000 income (an income which may qualify him for no tax obligations whatsoever).

Gas Expenses

As demonstrated in Exhibit 1, Defendant claims $1,657.07 in monthly gas expenses. This is false. An analysis of Defendant's ExxonMobil MasterCard reveals that even if all automobile related expenses (not just gasoline) are included for the entire family, CLAYTON has about doubled what he truly pays (on average) for auto-related expenses. This is money that could have been allotted for the fine.

In addition, this figure includes gasoline CLAYTON pays for his son who lives in Dallas and is going to medical school. CLAYTON's car insurance paperwork reveals that he pays the car insurance for four cars and that the rated drivers on this policy are: Donna (his wife); CLAYTON, Stacy (his daughter who lives outside the home and is in college), and Joshua (his 22 year old son who lives in Dallas and is attending medical school). CLAYTON insisted in Exhibit 2 that his wife is completely disabled and can only sit in a chair all day. In a 7/29/11 U.S. Probation Chronological Report, Defendant stated that his wife suffered a stroke and "is able to walk on her own, but not very far." Due to this, it is unknown whether the fourth car is for Donna or his 15 year old daughter who is in high school.

The bottom line, however, is that Defendant is paying car and gasoline expenses for children who no longer live at home and has stated to USPO he pays for gasoline for his 15 year old. Defendant does not have this luxury given his court imposed fine and costs of prosecution.

Attorney Expenses

Defendant lists $300 a month in attorney expenses with no record of payment for these claimed expenses.

Nominee Bank Account

Defendant is using his son's bank account as a nominee account to hide his true financial situation. He has withheld information about this nominee bank account, which contained his assets and would have shown an average balance over six months (Nov. 2011 thru April 2012) of $7,677.

These balances were in sharp contrast to the negative cash flow he was repeatedly providing to his Probation Officer.

Wherefore, premises considered, the United States respectfully requests that CLAYTON's supervision be revoked. Following any time he should receive for this revocation, the United States asks that CLAYTON be placed on an additional term of supervised release, be assigned a USPO in Austin who can more closely monitor his true financial situation, and that he actually pay his court ordered financial obligations.

    Respectfully submitted,

    ROBERT PITMAN
    United States Attorney

By:   /s/ Elizabeth Cottingham
    ELIZABETH COTTINGHAM
    Assistant U.S. Attorney
    816 Congress Avenue, Suite 1000
    Austin, TX 78701
    512/916-5858; Fax 512/916-5854
    State Bar No. 04865500

    /s/ Jen Ihlo
    JEN E. IHLO
    Trial Attorney, US DOJ, Tax Division
    601 D Street, NW, 7th Floor
    Washington, D.C. 20004
    202/514-5145
    State Bar No. 10384550

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CASE No. A-06-CR-069 SS |
| | § | |
| CHARLES THOMAS CLAYTON, | § | |
| | § | |
| Defendant. | § | |

## ORDER

Came on to be considered United States' Motion to Revoke Supervised Release. The Court Orders:

[ ]  The Issuance of a Warrant

[ ]  The Issuance of a Summons

ENTERED on this the ____ day of _____, 2012.

_____
SAM SPARKS
UNITED STATES DISTRICT JUDGE